FILED

MAY - 9 2013

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY M. CRUZ                    DEPUTY

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW STRONG,<br><br>                                    Plaintiff,<br>vs.<br><br>WALGREEN CO., doing business as Walgreens; and RUDOLPH BRAGG, Trustee of the Bragg Family Trust, Dated April 22, 1982,<br><br>                                    Defendants. | CASE NO. 09cv611 WQH (WVG)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW; ORDER |

HAYES, Judge:

The matter before the Court is the Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. The following motions are also before the Court: (1) Defendants' Motion to Strike Evidence (ECF No. 108); (2) Defendants' Motion for Judgment as a Matter of Law (ECF No. 109); (3) Plaintiff's Motion for Judgment on Partial Findings (ECF No. 114); (4) Plaintiff's Motion to Strike Legal Conclusions from Kim Blackseth's Testimony (ECF No. 115); and (5) Defendants' Motion to Strike Plaintiff's Post-Trial Motions and Proposed Findings of Fact/Conclusions of Law (ECF No. 116).

## PROCEDURAL HISTORY

On March 25, 2009, Plaintiff Matt Strong initiated this action by filing a complaint against Defendants Walgreen Co., doing business as Walgreens

1  ("Walgreens"), and Rudolf Bragg, Trustee of the Bragg Family Trust (collectively

2  "Defendants") (ECF No. 1).

3       On April 28, 2011, Plaintiff filed the First Amended Complaint – the operative

4  complaint in this case – against Defendants.  (ECF No. 64).  Plaintiff alleges that the

5  Walgreens store ("Store"), located at 215 North 2nd Street in El Cajon, California, is

6  a public sales or retail establishment designed or constructed after January 26, 1992,

7  and is not fully accessible to him because of architectural barriers. *Id.* at 2, 7.  Plaintiff

8  alleges claims against Defendants for violation of the Americans with Disabilities Act

9  ("ADA"), the California Disabled Persons Act, the California Unruh Act, and the

10  California Health and Safety Code.  Plaintiff seeks injunctive relief; declaratory relief;

11  attorney's fees, costs, and legal expenses; the statutory minimum damages; and interest.

12       On November 8, 2011, the Court granted Defendants' motion for summary

13  judgment  on Plaintiff's first claim for violation of the ADA with respect to the

14  following alleged architectural barriers: (1) the lack of a marked crossing in the parking

15  lot; (2) an incorrect sign in the van accessible parking space; (3) the location of

16  detectable warnings; (4) the lack of a designated checkstand for the disabled open at

17  all times; (5) the lack of a self-closing restroom door; (6) a toilet paper dispenser which

18  protrudes into the clear maneuvering space needed to access the water closet; (7) the

19  front roll of toilet paper located more than twelve inches from the water closet; (8) the

20  lack of access to the disposable seat cover dispenser in the bathroom; (9) improperly

21  or incompletely wrapped pipes in the bathroom; and (10) insufficient strike side

22  clearance on the pull-side of the restroom door.  (ECF No. 74 at 19).  The motion for

23  summary judgment was denied as to Plaintiff's ADA claim with respect to the

24  following alleged architectural barriers: (1) the disabled parking spaces are not outlined

25  in white; (2) improper slope in the disabled parking spaces and access aisles; and (3)

26  the toilet paper dispenser contains sharp edges. *Id.* at 17. With respect to the exercise

27  of supplemental jurisdiction over Plaintiff's remaining state law claims, the Court

28  issued the following Order to Show Cause:

> Plaintiff has also alleged several barriers relating to the three state law claims of (1) violation of the California Disabled Persons Act, (2) violation of the California Unruh Act, and (3) violation of the California Health and Safety Code. Plaintiff is ORDERED TO SHOW CAUSE why the Court should continue to exercise supplemental jurisdiction over Plaintiff's state claims by no later than twenty days from the date of this Order. Defendants may respond by no later than ten days from the date that Plaintiff's response to the order to show cause is filed.

*Id.* at 19. The parties responded to the Order to Show Cause with additional briefing. (ECF Nos. 75, 76, 78).

On May 30, 2012, the Court issued the Final Pretrial Order. (ECF No. 87). The Final Pretrial Order set forth the following issues of fact and law, and no others, which remained to be litigated at trial: (1) whether the following conditions constitute barriers to access, exist(ed) at the Store, and violate state or federal law: a) there is no marked crossing where the accessible route crosses the vehicular way; b) the signage posted at the van accessible parking space is incorrect; c) the slopes and cross slopes of the disabled parking spaces to the north side of the Store exceed 2.0%; d) the slopes and cross slopes of the access aisle(s) to the north side of the Store exceed 2.0%; e) the disabled parking spaces are not outlined in white; f) the detectable warnings are located on the ramp rather than prior to it; g) there are no check stands designated as being accessible to the disabled and open at all times for persons with disabilities; h) the restroom door is not self-closing; i) the toilet tissue dispenser protrudes in to the clear maneuvering space needed to access the water closet; j) the toilet tissue dispenser contains sharp edges; k) if having to use the front roll of toilet tissue, it is located more than twelve inches from the front of the water closet; l) the water closet is an obstruction to the use of the disposable seat cover dispenser; m) the pipes underneath the lavatory are improperly and/or incompletely wrapped; n) there is insufficient strike side clearance on the pull-side of the restroom door; (2) whether Plaintiff visited the Store and was denied "full and equal" enjoyment and use because of his disability; (3) whether Plaintiff was deterred from visiting the Store because of actual knowledge that the Store denied him "full and equal" enjoyment and use; (4) whether the slopes and

cross slopes of the disabled parking spaces to the north side of the Store violate the ADA Accessibility Guidelines, constitute a barrier to access, and exceed the construction industry tolerance for field conditions; (5) whether the slopes and cross slopes of the access aisle(s) to the north side of the Store violate the ADA Accessibility Guidelines, constitute a barrier to access and exceed the construction industry tolerance for field conditions; (6) whether the disabled parking spaces are not outlined in white and/or whether that condition violates the ADA or any other disabled accessibility requirement; (7) whether the toilet tissue dispenser contains sharp edges and whether said condition violates the ADA or any other disabled accessibility requirement; (8) whether a violation or violations of one or more construction-related accessibility standards denied Plaintiff full and equal access to the Store; and (9) whether Plaintiff personally encountered one or more construction-related accessibility violations as that phrase is defined in Civil Code section 55.56. *Id.* at 6-9.

On November 8, 2012, the Court held a motions in limine[1] hearing, followed by a bench trial. At the conclusion of the bench trial, the Court ordered the parties to file any motions to strike and/or motions to dismiss, as well as proposed findings of fact and conclusions of law, by January 28, 2013. (ECF No. 104).

On January 28, 2013, Defendants filed: (1) Proposed Findings of Fact and Conclusions of Law (ECF No. 110); (2) a Motion for Judgment as a Matter of Law pursuant to Federal Rule of Civil Procedure 50(a) (ECF No. 109); and (3) a Motion to Strike Evidence "concerning alleged accessibility issues that were not identified in the Final Pre-Trial Order" (ECF No. 108).

On January 31, 2013, Plaintiff filed: (1) Proposed Findings of Fact and Conclusions of Law (ECF No. 113); (2) a Motion for Judgment on Partial Findings

---

[1]On August 27, 2012, the parties filed motions in limine. (ECF Nos. 88, 89, 90, 91). On September 4, 2012, the parties filed oppositions. On November 8, 2012, the Court granted Plaintiff's unopposed motion in limine to exclude unpled affirmative defenses (ECF No. 88), and denied the remaining motions in limine (ECF Nos. 89, 90, 91) without prejudice and subject to renewal as motions to strike filed at the conclusion of trial.

pursuant to Federal Rule of Civil Procedure 52(c) (ECF No. 114); and (3) a Motion to Strike Legal Conclusions from Kim Blackseth's Testimony (ECF No. 115).

On February 4, 2013, Defendants filed a Motion to Strike (ECF No. 116), requesting that the Court strike Plaintiff's post-trial motions and Proposed Findings of Fact and Conclusions of Law as untimely.  (ECF No. 116).

On February 18, 2013, Plaintiff filed: (1) an opposition to the Motion to Strike Plaintiff's post-trial motions and Proposed Findings of Fact and Conclusions of Law as untimely (ECF No. 121); (2) an opposition to the Motion for Judgment on Partial Findings (ECF No. 120); and (3) an opposition to the Motion to Strike "certain accessibility issues that were not identified in the Final Pre-Trial Order" (ECF No. 122).  On February 18, 2013, Defendants filed: (1) an opposition to the Motion for Judgment on Partial findings (ECF No. 123-1); and (2) an opposition to the Motion to Strike Legal Conclusions from Kim Blackseth's Testimony (ECF No. 123).

On February 20, 2013, Plaintiff filed a Request for Judicial Notice of *Doran v. 7-Eleven*, No. 11-55619, 2013 WL 602251 (9th Cir. Feb. 19, 2013).  (ECF No 124). That request is granted.  *See Lee v. City of Los Angeles*, 250 F. 3d 668, 689 (9th Cir. 2001).

## FINDINGS OF FACT

Plaintiff, a quadriplegic, is disabled under the ADA and California law.  At the time Defendants answered Plaintiff's Complaint, Walgreens owned, operated, managed, and/or leased the Store, which is located at 215 North 2nd Street, El Cajon, CA, 92021.  Walgreens provides goods, services, facilities, privileges, advantages, or accommodations at the Store.  The Store is a sales or retail establishment, open to the public, which is intended for nonresidential use and whose operation affects commerce. The Store is a business establishment under California Civil Code sections 51 and 51.5, and a place of public accommodation as defined by 42 U.S.C. section 1218(7).  The Store was designed and constructed for first occupancy after January 26, 1993.

Plaintiff submitted four receipts into evidence showing that he purchased

several items at the Store with cash in February and March of 2009. (ECF No. 107 at 14); Exh. 2. Plaintiff testified that he traveled and continues to travel to the Store either by wheelchair or public bus in order to purchase household items. (ECF No. 107 at 12, 29-30). Plaintiff testified that he visited the Store on November 7, 2012, the day before trial, and that he intends to return to the Store in the future. *Id.* at 11, 18.

Plaintiff testified that as he crossed though the Store's disabled parking spaces on his way to the Store's entrance, the elevation of the surface changed and the wheels of his mechanized wheelchair lifted off the ground. *Id.* at 21. Plaintiff testified that no marked crossing existed from the vehicular way to the Store on his first visit in February of 2009; Plaintiff testified that he noticed a marked crossing from the vehicular way to the Store for the first time on his November 7, 2012 visit. *Id.* at 19-20, 48, 70. Plaintiff testified that there was a "van accessible sign" by the parking spaces at the Store which he found "confusing" because it was also a disabled parking sign. *Id.* at 20. Plaintiff testified that there were no detectible warnings on any of the ramps in the parking lot leading to the store. *Id.* at 39-40. Plaintiff testified that, in the restroom of the Store, the location of the toilet seat cover dispenser was too high for him to reach; the sharp edges on the toilet paper dispenser prevented him from taking any toilet paper to wipe off his leg bag; there were unwrapped hot water pipes that prevented him from washing his hands; and he had difficulty leaving the restroom because the door was locked. *Id.* at 32, 34-35, 59-60. Plaintiff testified that no register in the Store was marked as accessible for the disabled, and that he had to throw his items onto the counter in order to pay, which was "a pain" and "difficult." *Id.* at 38-39. Plaintiff testified that there was a sign hanging from the ceiling of the Store which indicated a checkout register for the disabled on his November 7, 2012 visit. *Id.* at 72.

Defendant's expert witness and disabled access consultant, Kim Blackseth, testified that he inspected the Store on two occasions: first on August 17, 2009, and again on November 7, 2012, the day before trial. *Id.* at 79, 118. Blackseth testified that he prepared two expert reports related to this case: (1) an independent report dated

October 14, 2009, which was based upon his August 17, 2009 inspection; and (2) a report purporting to rebut a report prepared by Plaintiff's designated expert witness, Reed Settle, who was not called to testify. *Id.* at 75. Blackseth testified regarding observations he made and measurements he took of the Store's facilities, and provided his expert opinion as to the Store's compliance with the relevant state and federal accessibility guidelines, i.e. the Americans with Disability and Accessibility Guidelines and the California Building Code.

Lance Zwanck, manager of the Store during all of 2009, testified regarding the checkout counters at the front of the store and the checkout stands in the pharmacy. *Id.* at 179-184. Zwanck testified that there were four checkout counters at the front of the Store, one of which was "a bit lower than the others" and was always open. *Id.* at 179-180.

Harold Hanson, a retired California Highway Patrolman, testified that he went to the Store on November 7, 2012 at the direction of Plaintiff and took photographs of the Store's checkout counters. *Id.* at 186-192; Exhs. 9-3, 9-4, 9-6, 9-9.

## CONCLUSIONS OF LAW[2]

### I.   Defendants' Motion to Strike (ECF No. 108) Evidence Regarding Accessibility Issues Not Identified in the Final Pretrial Order

Defendants move to strike evidence introduced at trial regarding "the tow-away

---

[2]Defendants contend that the Court should strike Plaintiff's post-trial motions and proposed findings of fact and conclusions of law because the documents were filed late. (ECF No. 116 at 1-2). Plaintiff asserts that he intended to request an extension until January 31, 2013, the day the documents were filed, but "rain and flooding [in Hawaii] prevented Scott Hubbard[, counsel for Plaintiff,] from effectively communicating with the associate attorney....." (ECF No. 121 at 2).
    Plaintiff filed his post-trial motions and proposed findings of fact and conclusions of law on January 31, 2013, one day after the January 30, 2013 deadline imposed by the Court; however, Defendants have not asserted, and the Court does not find, any prejudice as a result of that one-day delay. The Court will decline to exercise its discretion to strike Plaintiff's post-trial motions and proposed findings of fact and conclusions of law. *See Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1528 (9th Cir. 1993) (stating that whether to grant a motion to strike lies within the sound discretion of the district court) (citing Fed. R. Civ. P. 12(f)). The Motion to Strike (ECF No. 116) filed by Defendants is denied.

signage (Trial Transcript 85:3-86:1-25, 88:20-90:1-16) and [the] counters located in the pharmacy department (TT 100:16-103:2)." (ECF No. 108 at 1). Defendants contend that evidence relating to the tow-away sign and the pharmacy counters issues is not relevant because "these conditions are not identified in the Final Pre-Trial Order as issues in the trial." *Id.* at 2-3. Defendants assert that the Court denied Plaintiff's request to add the tow-away sign and pharmacy counters as alleged barriers of access to Plaintiff's original complaint. *Id.*

Plaintiff contends that the tow-away sign and pharmacy counter issues are encompassed by the Final Pretrial Order. Plaintiff asserts that the Final Pretrial Order "identifies improper signage at the van accessible parking space," and contends that "tow away signage *is* one of the signs that must be posted above the van accessible parking spaces." (ECF No. 122 at 2) (emphasis in original). Plaintiff asserts that the Final Pretrial Order "identified ... no checkstands designated as being open or accessible to the disabled," and contends that "Lance Zwanck testified that the pharmacy also had a checkstand counter so the lack of signage at that counter was included in the pretrial order, too." *Id.* "Long story short," Plaintiff asserts, "the Ninth Circuit has instructed district courts to liberally construe the pretrial order to permit trial of issues reasonably embraced within its language." *Id.*

"The court may hold a final pretrial conference to formulate a trial plan, including a plan to facilitate the admission of evidence." Fed. R. Civ. P. 16(e). "A Rule 16(e) order controls the subsequent course of action in the litigation unless it is modified by a subsequent order. Although we liberally construe pretrial orders, a theory will be barred if not at least implicitly included in the order." *Eagle v. Am. Tel. & Tel. Co.*, 769 F.2d 541, 548 (9th Cir. 1985) (citing *United States v. First National Bank of Circle*, 652 F.2d 882, 886 (9th Cir. 1981); Fed. R. Civ. P. 16(e)).

On February 18, 2011, Plaintiff filed a motion for leave to file a first amended complaint, seeking to add, *inter alia*, allegations of 19 barriers to access which were not alleged in the original complaint – including allegations that "the tow away sign

1  is incorrect" and "there is no lowered portion of the pharmacy counter." (ECF No. 48).
2  On April 18, 2011, the Court denied Plaintiff's request for leave to add the 19 new
3  barriers to the First Amended Complaint. (ECF No. 63 at 7-8). On May 30, 2012, the
4  Court issued the Final Pretrial Order, which identified the issues of fact and law to be
5  litigated at trial and stated that "no other" issues, besides those expressly identified in
6  the Order, remained to be litigated; the tow-away sign and pharmacy counter issues
7  were not identified in the Final Pretrial Order. (ECF No. 87 at 6, 12). Based upon the
8  factual allegations of the First Amended Complaint, the plain language of the Final
9  Pretrial Order, and the procedural history of this case, the Court finds that the tow away
10 sign and pharmacy counter issues were not "implicitly included in the pretrial order."
11 *Eagle*, 769 F.2d at 548 ("We find that the tax liability theory was not implicit in the
12 pretrial order. [Plaintiff's] initial and amended complaints allege that the minority
13 shareholders were injured by the refund [the defendant] was ordered to pay. Neither
14 complaint mentions the tax liability."). The Motion to Strike (ECF No. 108) filed by
15 Defendants is granted.

16 **II.    Plaintiff's Americans with Disabilities Act Claims**

17      Title III of the ADA prohibits discrimination "on the basis of disability in the full
18 and equal enjoyment of the goods, services, facilities, privileges, advantages, or
19 accommodations of any place of public accommodation by any person who owns,
20 leases (or leases to), or operates a place of public accommodation." 42 U.S.C. §
21 12182(a). To establish a violation of the ADA, Plaintiff must show that (1) he is
22 "disabled"; (2) Defendants own, lease, or operate a "public accommodation"; and (3)
23 he was denied full and equal treatment because of his disability. *See Molski v. M.J.*
24 *Cable*, 481 F.3d 724, 730 (9th Cir. 2007). The parties do not dispute that Plaintiff is
25 "disabled" and the Store is a "place of public accommodation" within the meaning of
26 the ADA.

27      The ADA Accessibility Guidelines ("ADAAG") "provides the objective contours
28 of the standard that architectural features must not impede disabled individuals' full

and equal enjoyment of accommodations." *Chapman v. Pier 1 Imports (U.S.), Inc.*, 631 F.3d 939, 945 (9th Cir. 2011) (en banc); 41 C.F.R. Subpart 101–19 .6 App. A. "If a particular architectural feature of a place of public accommodation is inconsistent with the ADAAG, a plaintiff can bring a civil action claiming that the feature constitutes a barrier that denies the plaintiff full and equal enjoyment of the premises in violation of the ADA." *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 905 (9th Cir. 2011) (citing 42 U.S.C. §§ 2000a–3(a), 12188(a)(2)). "The ADAAG's requirements are as precise as they are thorough, and the difference between compliance and noncompliance with the standard of full and equal enjoyment established by the ADA is often a matter of inches." *Chapman*, 631 F.3d at 945-46; *see also, e.g.*, ADAAG § 4.16.4 (requiring grab bar behind water closets to be at least thirty-six inches long); ADAAG § 4.19.6 ("Mirrors shall be mounted with the bottom edge of the reflecting surface no higher than 40 in (1015 mm) above the finish floor....").

A plaintiff has sufficient personal stake in the outcome of an ADA claim only to the extent that the alleged barrier relates to the plaintiff's personal disability. *Chapman*, 631 F.3d at 947; *see also Doran v. 7–Eleven*, Inc., 524 F.3d 1034, 1044 n. 7 (9th Cir. 2008) (explaining that a wheelchair-dependent plaintiff "may challenge only those barriers that might reasonably affect a wheelchair user's full enjoyment of the store"); *Steger v. Franco, Inc.*, 228 F.3d 889, 893 (8th Cir. 2000) (holding that a plaintiff who is not blind lacks standing to sue for ADA violations that only affect the blind).

With respect to Plaintiff's ADA claim, the following alleged barriers of access remain at issue: (1) improper slope in the disabled parking spaces and access aisles; (2) the toilet paper dispenser contains sharp edges; and (3) the disabled parking spaces are not outlined in white. *See* ECF No. 74 at 17 (order denying Plaintiff's motion for summary judgment and granting in part Defendants' motion for summary judgment); ECF No. 87 (Final Pretrial Order).

//

**A.    Slopes and cross slopes of the disabled parking spaces and access aisles**

"A cross slope that is too steep can cause a wheelchair occupant to have difficult steering and, in extreme cases, cause the wheelchair to overturn." *Hubbard v. 7-Eleven, Inc.*, 433 F. Supp. 2d 1134, 1137 (S.D. Cal. 2006) (citing *Parr v. L & L Drive-Inn Rest.*, 96 F. Supp. 2d 1065, 1087 (D. Haw. 2000)). Pursuant to the ADAAG, "[p]arking spaces and access aisles shall be level with surface slopes not exceeding 1:50 (2%) in all directions." 28 C.F.R. part 36, App. D, § 4.6.3; *see also* 28 C.F.R. part 36 § 4.3.7; *Hubbard*, 433 F. Supp. 2d at 1137 ("Under the federal law, a cross slope of an accessible route cannot exceed 1:50, or 2%.").

The ADAAG further provides that "[a]ll dimensions are subject to conventional building industry tolerances for field conditions." 28 C.F.R. part 36, App. D, § 3.2. "This is intended to allow for construction tolerances, such as variations based on field, material, manufacturing and workmanship conditions." *Cherry v. City Coll. of San Francisco*, C 04-04981 WHA, 2006 WL 6602454, *5 (N.D. Cal. Jan. 12, 2006). The district court in *Cherry* explained:

> [T]he burden is on plaintiffs to prove that the variance exceeds the allowed tolerance. It is not enough to simply show that a particular bathroom stall, for example, is 'less than' the required width. The approximate extent of any shortfall must be proven. And, the dimensional tolerance at the time of construction must be proven.

*Cherry*, 2006 WL 6602454 at *6.

Plaintiff testified that, on each of his visits, he crossed though disabled parking spaces on the north side of the Store and, as he approached the entrance, "the elevation on the parking lot change[d] ...[,] lifting [his] chair off the ground." (ECF No. 107 at 21). When Plaintiff was asked whether the elevation change "makes it difficult for you to cross those spaces," Plaintiff responded: "It is unsafe." *Id.* Plaintiff testified that it is difficult for him to control his wheelchair when he has only two wheels on the ground. *Id.* at 69. Plaintiff testified that he noticed no difference in the elevation of the disabled parking spaces when he visited the Store the day before trial because his

1  wheels still lifted off the ground when he traveled over the slopes. *Id.* at 57. Plaintiff
2  estimated that his wheels lift "a foot" off of the ground as he travels over the disabled
3  parking space to the right of the access aisle. *Id.* at 58.[3]

4         Blackseth testified that he made several measurements of the slopes of the
5  disabled parking spots and access aisles in the Store's parking lot area. *Id.* at 94.
6  Blackseth testified that his August 17, 2009 measurements indicated slopes of between
7  2% and 2.9%. *Id.* at 95. Blackseth testified that he "found no condition ... that
8  exceeded two percent [slope]..." during his November 7, 2012 inspection.[4] *Id.* at 129.
9  Blackseth testified that he "would find it inconceivable that [his] wheels would leave
10 the ground at anything ... under four or five percent [slope]." *Id.* at 132. Blackseth
11 testified that he has never experienced a situation in his entire life in a motorized
12 wheelchair where his wheels raised a foot off of the ground. *Id.* at 133. Blackseth
13 testified that if he were traveling on his motorized wheelchair over a 2.9% slope, the
14 slope would be "imperceptible" to him without measuring equipment. *Id.* at 132.
15 Blackseth testified that his motorized wheelchair is similar to Plaintiff's wheelchair.
16 Regarding the slopes of parking spaces and access aisles generally, Blackseth testified:

17         Both the federal and state requirements prohibit anything that exceeds two
           percent [slope] in any direction.... Both the federal and the state codes[,
18         i.e. the ADA and the California Building Code,] have identical language.
           They are in my report, but to paraphrase, it talks about the measurements
19         are to be within quote-unquote, normal construction industry standards,
           end quote....

20
           [What this means is that] it is relative to the work you are doing. Clearly
21         the construction – as a general contractor for many years, the tolerances
           that you use when you are framing are different than the tolerances you
22

23
           [3]The Court did not receive the photographs numbered 84 and 86 on Exhibit 3-3
24 into evidence.

25         [4]Plaintiff objected to Defendants' questioning of Blackseth about his November
   7, 2012 inspection as "beyond his scope of expert disclosure." (ECF No. 107 at 123).
26 The Court overruled that objection and stated that "you can address it in the [post-trial]
   briefing." *Id.* at 124. At the conclusion of the bench trial, the Court instructed the
27 parties file any "motions to strike, motions to dismiss, ... and your initial proposed
   findings of fact and conclusions of law" by January 28, 2013. *Id.* at 193. The record
28 reflects that Plaintiff did not file any motion to strike Blackseth's testimony regarding
   his November 7, 2012 inspection.

use when you are hanging cabinet work, and that is what the code section is trying to imply.

We're using asphalt which is elastic and it swells. It is not a precision material. In my experience both as a contractor and as an expert, one percent, an 8th of an inch per foot, is a fairly exacting standard in my opinion within normal construction industry standards.

*Id.* at 130-31. Blackseth based his testimony regarding the constructional tolerance of asphalt on "[his] experience working with the material[, his] experience as an expert in this field for 20 some years[, his] experience as a user of those spaces, in a wheelchair, but primarily [his] experience as a general contractor." *Id.* at 159.

The testimony on this issue is inconsistent. Blackseth testified that the slopes and cross-slopes at the Store were as steep as 2.9% on August 17, 2009, but did not exceed 2.0% on November 7, 2012. On the other hand, Plaintiff testified that the slopes and cross-slopes remained unchanged between his 2009 visits and his November 7, 2012 visit. The Court finds Blackseth's testimony to be more reliable and believable than Plaintiff's testimony on this issue for two main reasons. First, Blackseth's testimony was based upon measurements that he took with sophisticated measuring equipment, while Plaintiff's testimony was based solely upon his subjective recollections that, over the course of three years, his wheels have consistently lifted off the ground the same amount as he traversed the Store's parking lot. Second, the Court finds Plaintiff's statement that his wheels lifted a foot off the ground not to be credible in light of Blackseth's expert opinion that a 2.9% slope would be imperceptible to someone traveling over it. The Court finds that Plaintiff has failed to prove, by a preponderance of the evidence, that a slope exceeding 2% currently exists at the Store. Finally, even if a 2.9% slope does exist, Blackseth testified that a 1% variance in the slope of asphalt is within industry tolerances, *id.* at 131, 134, and Plaintiff submitted no evidence to the contrary; accordingly, the Court finds that Plaintiff has failed to prove that a 1% variance in the slope of asphalt exceeds the "conventional building industry tolerances for field conditions." *Cherry*, 2006 WL 6602454 at *6 ("[T]he burden is on plaintiffs to prove that the variance exceeds the allowed tolerance.").

Plaintiff has failed to prove, by a preponderance of the evidence, that the slope and/or cross-slope of any disabled parking space or access aisle constitutes a barrier to access pursuant to the ADAAG.   The Court concludes that Defendants are entitled to judgment in their favor on Plaintiff's ADA claim as to this alleged barrier.

## B.    Sharp Edges on Toilet Paper Dispenser

Pursuant to the ADAAG, "[a] handrail or grab bar and any wall or other surface *adjacent* to it shall be free of any sharp or abrasive elements." 28 C.F.R. part 36, App. D, § 4.26.4 (emphasis added). While the ADAAG does not define the word "adjacent," it is defined in the most recent edition of Black's Law Dictionary as "lying near or close to, but not necessarily touching." Black's Law Dictionary (9th ed. 2009).

Plaintiff testified that the toilet paper dispenser "was too low. I couldn't reach it. It was like you had to reach under the outlet.   There was sharp edges, plastic. I couldn't reach my hands under there and was afraid I would cut my hands underneath the bottom of it, and I wasn't able to actually grab any toilet paper at that time." (ECF No. 107 at 35).   Plaintiff testified that he did not cut himself on the toilet paper dispenser. *Id.*   Blackseth testified that he inspected the bottom of the toilet paper dispenser and noticed "a plastic serrated device that allows the paper to be torn off. [The serrated device] is approximately 20 inches below the grab bar and about 16 inches above the ground. ... It was serrated, but I ... didn't notice anything sharp or anything that would have damaged my hand." *Id.* at 106-07.

Based upon Blackseth's uncontroverted testimony that the grab bar was 20 inches from the serrated device on the toilet paper dispenser, the Court does not find that the serrated device was "near or close to" the grab bar in the context of a bathroom stall. The Court concludes that Plaintiff has failed to prove, by a preponderance of the evidence, that any sharp edge on the toilet paper dispenser "constitutes a barrier that denies the plaintiff full and equal enjoyment of the premises in violation of the ADA." *Oliver*, 654 F.3d at 905. The Court concludes that Defendants are entitled to judgment in their favor on Plaintiff's ADA claim as to this alleged barrier.

### C.   Outlining of disabled parking spaces

Plaintiff testified that the paint was worn on the disabled parking spaces, and testified that "you can barely see it" and "you could see the asphalt right through the paint." (ECF No. 107 at 22).

Plaintiff has not cited to any ADAAG guideline regulating the outlining of disabled parking spaces. Plaintiff has failed to prove, by a preponderance of the evidence, that the worn paint on the disabled parking spaces "constitutes a barrier that denies the plaintiff full and equal enjoyment of the premises in violation of the ADA." *Oliver*, 654 F.3d at 905. Even if the outlining of the parking spaces did violate an ADAAG guideline, the Court finds that such a barrier would not relate to the plaintiff's personal disability. *See Chapman*, 631 F.3d at 947; *see also Doran*, 524 F.3d at 1044 n. 7 (explaining that a wheelchair-dependent plaintiff "may challenge only those barriers that might reasonably affect a wheelchair user's full enjoyment of the store"). The Court concludes that Defendants are entitled to judgment in their favor on Plaintiff's ADA claim as to this alleged barrier.

### III.   Plaintiff's State Disability Law Claims

Unlike the ADA, which only provides injunctive relief, the Unruh Act and the California Disabled Persons Act ("CDPA") provide a statutory minimum amount of damages. *See* 42 U.S.C. § 12205; Cal. Civ. Code §§ 52(a), 54.3(a). A violation of the ADA constitutes a violation of the Unruh Act and the CDPA. *See* Cal. Civ. Code § 54.1(d) (regarding the CDPA); *Munson v. Del Taco, Inc.,* 46 Cal. 4th 661, 687 (Cal. App. 2009) ("A plaintiff who establishes a violation of the ADA, ... need not prove intentional discrimination in order to obtain damages under [California's Unruh Act] section 52."). As discussed above, *see supra* Part II., Plaintiff has failed to prove any violation of the ADA.

In addition, "[a] violation of a California Code of Regulations, title 24 (title 24) building standard that denies access to a disabled individual has been found to constitute a violation of both the Unruh Act and the [California Disabled Persons

1 Act]." *Californians for Disability Rights v. Mervyn's LLC*, 165 Cal. App. 4th 571, 585-

2 86 (2008) (citations omitted). The 2009 Construction Related Accessibility Standards

3 Compliance Act ("CRAS"), Cal. Civ. Code §§ 55.51–55.57, provides in pertinent part:

4     (a) Statutory damages under either [the Unruh Act] or [the

5 California Disabled Persons Act] may be recovered in a
construction-related accessibility claim against a place of public

6 accommodation only if a violation or violations of one or more
construction-related accessibility standards denied the plaintiff

7 full and equal access to the place of public accommodation on a
particular occasion.

8     (b) A plaintiff is denied full and equal access only if the plaintiff
personally encountered the violation on a particular occasion, or

9 the plaintiff was deterred from accessing a place of public
accommodation on a particular occasion.

10

11     (c) A violation personally encountered by a plaintiff may be
sufficient to cause a denial of full and equal access if the plaintiff

12 experienced difficulty, discomfort, or embarrassment because of
the violation.

13 Cal. Civ. Code § 55.56 (a)-(c).

14     In *Mundy v. Pro-Thro Enters.*, 192 Cal. App. 4th Supp. 1 (2011), the Appellate

15 Division of the California Superior Court held that section 55.56(c) requires evidence

16 of difficulty, discomfort, or embarrassment in order for a plaintiff to recover statutory

17 damages. The Court of Appeals for the Ninth Circuit recently issued an unpublished

18 opinion, citing *Mundy*, which affirmed the district court's denial of statutory damages

19 under the Unruh Act and the CDPA to a plaintiff who failed to prove that "he

20 personally encountered the violation and 'experienced difficulty, discomfort, or

21 embarrassment because of the violation.'" *Doran v. 7-Eleven*, No. 11-55619, 2013 WL

22 602251, *2 (9th Cir. Feb. 19, 2013) (quoting Cal. Civ. Code § 55.56 (c)); *see also*

23 *Kohler v. Presidio Int'l, Inc.*, CV 10-4680 PSG PJWX, 2013 WL 1246801 (C.D. Cal.

24 Mar. 25, 2013) (citing *Doran* and *Mundy*, and holding that "Plaintiff must offer

25 evidence of difficulty, discomfort, or embarrassment in relation to his personal

26 encounter of a barrier in order to recover statutory damages under the Unruh Act or the

27 [C]DPA."). The Court finds the reasoning of *Doran* and *Mundy* to be persuasive. In

28 order for Plaintiff to recover statutory damages under the Unruh Act or the CDPA, the

1  Court holds that Plaintiff must prove that he experienced difficulty, discomfort, or
2  embarrassment because of an encounter with a violation of an accessibility standard.

3      **A.    No marked crossing where the accessible route crosses the vehicular**
4          **way**

5      Plaintiff testified that, on his first trip to the Store in February of 2009, there was
6  no marked crossing from the vehicular way to the Store and "you [would] have to
7  dodge cars." (ECF No. 107 at 19-20). Plaintiff testified that on November 7, 2012, the
8  day before trial, he noticed a marked crossing from the vehicular way to the Store for
9  the first time. *Id.* at 48, 70. Plaintiff testified that there was never a situation where he
10 was almost hit by a vehicle while traversing the parking lot. *Id.* at 50. Plaintiff was
11 asked the following question: "It wasn't very difficult for you to roll through the
12 parking lot in your ... mechanized wheelchair, was it?" Plaintiff answered, "No." *Id.*
13 at 47.

14     Blackseth testified that "there was no marked crossing" during his August 17,
15 2009 inspection; however, Blackseth testified that "there was no requirement that I was
16 able to find in the ... California Building Code that required the marked crossing." *Id.*
17 at 125. Blackseth testified that, during his inspection on November 7, 2012, "[t]here
18 was a marked crossing installed," which "connected a walkway from the public
19 sidewalk and the bus stop through a landscaped area with a walkway, then a painted
20 marked crosswalk that attached to the access aisle and curb ramp to get a person onto
21 the walkway in front of Walgreens." *Id.* at 124.

22     Plaintiff does not cite to any building standard that regulates marked crossings
23 in accessible routes. Plaintiff contends that the California Manual on Uniform Traffic
24 Control Devices ("MUTCD") requires marked crossings in parking lots, but does not
25 cite to any case supporting that proposition. Defendants contend that the California
26 MUTCD does not apply on private property.

27     The Court finds that Plaintiff has failed to prove, by a preponderance of the
28 evidence, that the lack of a marked crossing violates a construction-related accessibility

standard.  Even if the MUTCD did apply and the Store was in violation of one of its

provisions, Plaintiff testified that he had "no [difficulty]" traveling through the parking

lot on his mechanized wheelchair.  Although Plaintiff testified, in the abstract, that

"you have to dodge cars" crossing the parking lot, there is no evidence that Plaintiff

suffered any "discomfort or embarrassment" due to the lack of a marked crossing on

any particular occasion.  Cal. Civ. Code § 55.56.  Plaintiff provided no evidence that

he was "deterred from accessing" the Store.  Cal. Civ. Code § 55.56(b).  "A claimant

who offers no such evidence is 'not entitled as a matter of law' to recover statutory

damages under the CRAS.  By the same token, he is not entitled to recover statutory

damages under the Unruh Act or the CDPA." *Doran*, 2013 WL 602251, at *2 (citing

*Mundy*, 192 Cal. App. 4th Supp. at 5; *Munson*, 208 P.3d at 633–34 (noting that the

CRAS was intended to protect "businesses from abusive access litigation" and "impose

limitations on damages")).  The Court concludes that Defendants are entitled to

judgment in their favor on Plaintiff's CDPA and Unruh Act claims as to this alleged

barrier.

**B.     No van accessible parking space sign below disabled parking sign**

Plaintiff testified that there was a "van accessible sign" by the parking spaces at

the Store, but he found the sign "confusing" because it was also a disabled parking

sign.  (ECF No. 107 at 20).  Blackseth testified that he observed a van accessible

parking sign during his 2009 and 2012 inspections. *Id.* at 127.

Plaintiff does not cite to any building standard requiring a van accessible sign

separate from a traditional disabled parking sign.  The Court finds that Plaintiff has

failed to prove, by a preponderance of the evidence, that the lack of a van accessible

parking sign separate from the disabled parking sign violated a construction-related

accessibility standard. Even if the Store's sign did violate an accessibility standard,

Plaintiff testified that he merely found the sign "confusing." *Id.* at 20.  Plaintiff

testified that he never drove a vehicle to the Store, never attempted to drive a vehicle

to the Store, and was never driven to the Store in anyone's vehicle. *Id.* at 46. Plaintiff

offered no evidence that he suffered any "difficulty, discomfort or embarrassment" due to the lack of a marked crossing, nor did Plaintiff provide any evidence that he was deterred from accessing the Store. Cal. Civ. Code § 55.56(c). "A claimant who offers no such evidence is 'not entitled as a matter of law' to recover statutory damages under the CRAS. By the same token, he is not entitled to recover statutory damages under the Unruh Act or the CDPA." *Doran*, 2013 WL 602251 at *2 (citations omitted). The Court concludes that Defendants are entitled to judgment in their favor on Plaintiff's CDPA and Unruh Act claims as to this alleged barrier.

### C.   Slopes and cross slopes of the disabled parking spaces and access aisle(s)

Pursuant to the California Building Code, "[s]urface slopes of accessible parking spaces and access aisles shall be the minimum possible and shall not exceed one unit vertical in 50 units horizontal (2-percent slope) in any direction.   24 C.C.R § 1129B.3.4. The California Building Code states that "[a]ll dimensions are subject to conventional industry tolerances except where the requirement is stated as a range with specific minimum and maximum end points." 24 C.C.R. § 1101B.5; *see also* 28 C.F.R. Part 36 App. A at § 3.2 (pursuant to the ADAAG, "[a]ll dimensions are subject to conventional building industry tolerances for field conditions."). The "industry tolerance" provision "is intended to allow for construction tolerances, such as variations based on field, material, manufacturing and workmanship conditions." *Cherry v. City Coll. of San Francisco*, C 04-04981 WHA, 2006 WL 6602454, *5 (N.D. Cal. Jan. 12, 2006).

Blackseth testified that, during his August 17, 2009 inspection of the Store's premises, each of his measurements of the parking spots and access aisles indicated a slope of between 2 and 2.9 percent. (ECF No. 107 at 95). Blackseth testified that if he were traveling on his motorized wheelchair over a 2.9% slope, the slope would be "imperceptible" to him without measuring equipment. *Id.* at 132.

The Court finds that the California Building Code's surface slope requirement

is "subject to conventional industry tolerances" because the requirement is not "stated as a range with specific minimum and maximum end points"; while the regulation lists a specific maximum slope of 2%, it also calls for a nonspecific "minimum possible" slope at the low end of the range. 24 C.C.R § 1101B.5. As discussed above, Blackseth testified that a 1% variance in slope is within industry tolerances for asphalt, and Plaintiff submitted no evidence to the contrary. Accordingly, the Court finds that Plaintiff has failed to prove that a 1% variance in slope exceeds the "conventional building industry tolerances for field conditions." *Cherry*, 2006 WL 6602454 at *6 ("[T]he burden is on plaintiffs to prove that the variance exceeds the allowed tolerance. It is not enough to simply show that a particular bathroom stall, for example, is 'less than' the required width. The approximate *extent* of any shortfall must be proven."); 24 C.C.R § 1101B.5. Plaintiff has failed to prove, by a preponderance of the evidence, that any slope and/or cross-slope in a parking space or access aisle violated a construction-related accessibility standard.

Even if a 2.9% slope did violate an accessibility standard, the Court does not find Plaintiff's testimony that his wheels lifted off the ground to be credible, especially in light of Blackseth's expert opinion that a 2.9% slope would be imperceptible to someone traveling over it. *Id.* at 20. Plaintiff offered no other evidence that he suffered any "difficulty, discomfort or embarrassment" due to the slope of the disabled parking spaces or access aisles, nor did Plaintiff provide any evidence that he was deterred from accessing the Store. Cal. Civ. Code § 55.56(c). "A claimant who offers no such evidence is 'not entitled as a matter of law' to recover statutory damages under the CRAS. By the same token, he is not entitled to recover statutory damages under the Unruh Act or the CDPA." *Doran*, 2013 WL 602251 at *2 (citations omitted). The Court concludes that Defendants are entitled to judgment in their favor on Plaintiff's CDPA and Unruh Act claims as to this alleged barrier.

### D.   Outlining of disabled parking spaces

The California Building Code provides detailed requirements for disabled

1  parking spaces. *See* 24 C.C.R. § 1129.B.3(1).  Plaintiff testified that the paint was
2  worn on the Store's disabled parking spaces and that "you could see the asphalt right
3  through the paint." (ECF No. 107 at 22).  However, Plaintiff has offered no evidence
4  that he was "deterred from accessing" the Store due to insufficient outlining of the
5  parking spaces, Cal. Civ. Code § 55.56(b), nor has Plaintiff offered any evidence that
6  he "personally encountered" the violation and "experienced difficulty, discomfort, or
7  embarrassment because of the violation." Cal. Civ. Code § 55.56(c).  "A claimant who
8  offers no such evidence is 'not entitled as a matter of law' to recover statutory damages
9  under the CRAS.  By the same token, he is not entitled to recover statutory damages
10  under the Unruh Act or the CDPA." *Doran*, 2013 WL 602251 at *2 (citations omitted).
11  The Court concludes that Defendants are entitled to judgment in their favor on
12  Plaintiff's CDPA and Unruh Act claims as to this alleged barrier.

13       **E.   Detectable warnings**

14       Pursuant to the California Building Code, a "[d]etectible warning is a
15  standardized surface or feature built into or applied to walking surfaces or other
16  elements to warn visually impaired persons of hazards in the path of travel." 24 C.C.R.
17  § 1102B.

18       Plaintiff testified there were no detectible warnings on any of the ramps in the
19  parking lot leading to the store.  (ECF No. 107 at 39-40).  Plaintiff testified that the
20  parking lot "doesn't have any bumps or any kind of motion detector showing you it is
21  going to be a ramp." *Id.* at 40.  Plaintiff was asked the following question: "So does
22  it make it difficult if there aren't detectible warnings?"; Plaintiff gave the following
23  answer: "At least – at least it let's you know that you are coming upon a ramp or
24  actually dropping from one level to another, yes." *Id.*

25       Blackseth testified that "[d]etectable warnings as defined in the code are the
26  yellow raised bump mats that you see at the corners. The grooves at the top of the curb
27  ramps are different issues. They are not called detectable warnings. Both the grooves
28  and the detectable warnings in my opinion are there for the visually impaired." *Id.* at

1  136. Blackseth based that opinion on "[y]ears of experience with the code, [his] code
2  advisory committee [experience], the Office of the State Architect, [and his] time in the
3  Building Standards [Commission]...." *Id.* at 136.

4      Plaintiff is a quadriplegic. Plaintiff is not visually impaired. The Court finds
5  Blackseth's expert testimony regarding the purpose of detectable warnings to be
6  credible. Although Plaintiff testified generally that a detectible warning "lets you know
7  that you are coming upon a ramp," the Court finds that Plaintiff has failed to prove, by
8  a preponderance of the evidence, that he suffered any "difficulty, discomfort, or
9  embarrassment ... on a particular occasion" as a result of the lack of detectable
10 warnings at the Store. Cal. Civ. Code § 55.56. "A claimant who offers no such
11 evidence is 'not entitled as a matter of law' to recover statutory damages under the
12 CRAS. By the same token, he is not entitled to recover statutory damages under the
13 Unruh Act or the CDPA." *Doran*, 2013 WL 602251 at *2 (citations omitted); *see also*
14 *Chapman*, 571 F.3d at 858 (stating that, with respect to an ADA claim, "[t]he Ninth
15 Circuit does not ... grant a plaintiff standing to challenge un-encountered barriers not
16 related to his or her disability. For example, a non-blind, non sight-impaired person
17 who needs a wheelchair for mobility cannot challenge barriers that would only restrict
18 access for a person who is blind or sight-impaired."). The Court concludes that
19 Defendants are entitled to judgment in their favor on Plaintiff's CDPA and Unruh Act
20 claims as to this alleged barrier.

21     **F.**   **Check stands**

22     The California Building Code provides:

23     In new and existing construction, accessible check stands shall provide a
   clear checkout aisle width of 36 inches (914 mm) with a maximum
24 adjoining counter height not exceeding 38 inches (965 mm) above the
   finish floor. The top of the counter lip shall not exceed 40 inches (1016
25 mm) above the finish floor. Accessible checkstands shall always be open
   to customers with disabilities and shall be identified by a sign clearly
26 visible to those in wheelchairs. The sign shall display the international
   symbol of accessibility in white on a blue background and shall state
27 'This check stand to be open at all times for customers with disabilities.'

28 24 C.C.R. § 1110B.1.3.

1    Plaintiff testified that after he left the Store restroom, he went to the checkout
2    register.  (ECF No. 107 at 38).  Plaintiff testified that there was not a register in the
3    Store marked as accessible for the disabled and open at all times.  *Id.*  Plaintiff testified
4    that he never asked any employees whether there were any checkout registers with a
5    lower counter.  *Id.* at 63.  Plaintiff testified that when he was visiting the Store, he
6    noticed a checkout register with a lower counter as he traveled to the checkout registers
7    with higher counters.  *Id.* at 64.  Plaintiff testified that no employees were stationed at
8    the register with the lower counter and that "it was used for storage ... There [were]
9    boxes, all kinds of stuff on top of the counter.  It wasn't being used for purchase in and
10   out."  *Id.* at 64-65.  Plaintiff testified that in order to pay for his items at the Store, he
11   "had to throw [his items] up on the counter," which was "a pain," and "difficult."  *Id.*
12   at 39.

13   Lance Zwanck, manager of the Store during all of 2009, testified that there were
14   four checkout counters at the front of the Store, one of which was a bit lower than the
15   others and was always open.  *Id.* at 179-180.  Zwanck testified that he never received
16   a complaint from a disabled customer unable to use the lower counter.

17   Blackseth testified that he measured the height of the checkout counters at the
18   front of the store at 36 inches, except for one counter which he measured at 34 inches.
19   *Id.* at 103-04.  Blackseth stated that, "[f]or purposes of trying to resolve this case" and
20   because "it was cheap and easy to do," he recommended that Walgreens add a sign
21   identifying the 34-inch checkout stand as accessible for the disabled.  *Id.* at 104.

22   The uncontroverted evidence presented at trial shows that each checkout counter
23   at the Store was below 40 inches from the floor and in compliance with 24 C.C.R. §
24   1110B.1.3.  The Court does not find that 24 C.C.R. § 1110B.1.3 requires the posting
25   of an accessible sign if every checkout aisle is accessible to the disabled; such a
26   requirement would force Defendants to post an accessible sign above every checkout
27   aisle and leave every checkout aisle open at all times. The Court finds that Plaintiff has
28   failed to prove, by a preponderance of the evidence, that any checkout counter or

checkout aisle violated a construction-related accessibility standard. Even if an accessible sign should have been posted, Plaintiff has offered no evidence that he was "deterred from accessing" the Store due to the lack of such a sign, Cal. Civ. Code § 55.56(b), nor has Plaintiff offered any evidence that he "personally encountered" the violation and "experienced difficulty, discomfort, or embarrassment because of the violation." Cal. Civ. Code § 55.56(c). "A claimant who offers no such evidence is 'not entitled as a matter of law' to recover statutory damages under the CRAS. By the same token, he is not entitled to recover statutory damages under the Unruh Act or the CDPA." *Doran*, 2013 WL 602251 at \*2 (citations omitted). The Court concludes that Defendants are entitled to judgment in their favor on Plaintiff's CDPA and Unruh Act claims as to this alleged barrier.

### G.     Restroom stall door

Pursuant to the California Code of Regulations, "[t]he water closet compartment shall be equipped with a door that has an automatic-closing device...." 24 C.C.R. § 1115B.3.1.4-4.

Blackseth testified that, during his August 17, 2009 inspection, he observed a "closer" – i.e. a "device that is in the hinge that brings the door back to the latch so that a disabled user doesn't have to pull it closed" – on the door of the restroom stall. (ECF No. 107 at 105, 138). Blackseth testified that, during that initial inspection, the door "did not close completely, stopped about an inch short of the jamb. The closer was there, but it stopped approximately an inch from the strike." *Id.* at 105. Blackseth testified that, during his November 7, 2012 inspection, the closer had been adjusted and "[t]here was no gap." *Id.* at 139.

Based upon Blackseth's uncontroverted testimony, the Court finds that Plaintiff has failed to prove, by a preponderance of the evidence, that the water closet compartment door lacked an automatic-closing device in violation of a construction-related accessibility standard. Even if the water closet compartment door did violate an accessibility standard, Plaintiff has offered no evidence that he was "deterred from

- 24 -

09cv611 WQH (WVG)

accessing" the Store due to the lack of such a sign, Cal. Civ. Code § 55.56(b), nor has Plaintiff offered any evidence that he "personally encountered" the violation and "experienced difficulty, discomfort, or embarrassment because of the violation." Cal. Civ. Code § 55.56(c). "A claimant who offers no such evidence is 'not entitled as a matter of law' to recover statutory damages under the CRAS. By the same token, he is not entitled to recover statutory damages under the Unruh Act or the CDPA." *Doran*, 2013 WL 602251 at *2 (citations omitted). The Court concludes that Defendants are entitled to judgment in their favor on Plaintiff's CDPA and Unruh Act claims as to this alleged barrier.

## H.   Toilet tissue dispenser

### 1.   Sharp Edges

The California Building Code provides: "A grab bar and any wall or other surface adjacent to it shall be free of any sharp or abrasive elements." 24 C.C.R. § 1115B.7.3. For the reasons stated above, *see supra* Part II.B., Defendants have failed to prove that the dispenser constituted a barrier of access pursuant to 24 C.C.R. § 1115B.7.3 because the toilet paper dispenser is not "adjacent" to the grab bar; accordingly, Defendants are entitled to judgment in their favor on Plaintiff's CDPA and Unruh Act claims as to this alleged barrier.

### 2.   Protruding Object

The California Building Code provides:

> Objects projecting from walls (for example, telephones), with their leading edges between 27 inches (686 mm) and 80 inches (2032 mm) above the finished floor, shall protrude no more than 4 inches (102 mm) into walks, halls, corridors, passageways or aisles. Objects mounted with their leading edges at or below 27 inches (686 mm) above the finished floor may protrude any amount. Free-standing objects mounted on posts or pylons may overhang 12 inches (305 mm) maximum from 27 inches (686 mm) to 80 inches (2032 mm) above the ground or finished floor. Protruding objects shall not reduce the clear width of an accessible route or maneuvering space.

24 C.C.R. § 1133.B.8.6.1. Blackseth testified that, during both of his inspections, the toilet paper dispenser protruded 3.5 inches from the wall. (ECF No. 107 at 95, 140).

Blackseth testified that the toilet paper dispenser "is under 27 inches [from the floor]." *Id.* at 96. Plaintiff testified that he does not know how far the toilet paper dispenser sticks out from the wall. *Id.* at 40.

Based upon Blackseth's uncontroverted testimony, the Court finds that the toilet paper dispenser was located under 27 inches from the floor, and therefore "may protrude any amount." 24 C.C.R. § 1133.B.8.6.1. Plaintiff has failed to prove, by a preponderance of the evidence, that the dispenser violated a construction-related accessibility standard due to the distance it protruded from the wall. The Court concludes that Defendants are entitled to judgment in their favor on Plaintiff's CDPA and Unruh Act claims as to this alleged barrier.

### 3.   Location of the Toilet Paper Dispenser

The California Building Code provides: "Toilet tissue dispensers shall be located on the wall within 12 inches (305 mm) of the front edge of the toilet seat, mounted below the grab bar, at a minimum height of 19 inches (485 mm), and 36 inches (914 mm) maximum to the far edge from the rear wall." 24 C.C.R. § 1115B.8.4.

Blackseth testified that, during both of his inspections, the toilet paper dispenser was a "double-roll dispenser" and that "there was a roll of toilet paper well within 36 inches of the back wall." (ECF No. 107 at 96). Blackseth testified that "[t]he second roll may have exceeded [the 36-inch distance]...." *Id.*

Based upon Blackseth's uncontroverted testimony, the Court finds that the toilet paper dispenser was located within 36 inches of the back wall. No evidence was presented at trial to suggest that the toilet paper dispenser was located more than 12 inches from the toilet seat. Plaintiff has failed to prove, by a preponderance of the evidence, that the dispenser violated a construction-related accessibility standard due to its distance from either the back wall or the toilet seat. The Court concludes that Defendants are entitled to judgment in their favor on Plaintiff's CDPA and Unruh Act claims as to this alleged barrier.

### I.   Location of the disposable seat cover dispenser

The California Building Code provides:

> Where towel, sanitary napkins, waste receptacles, dispensers, other equipment and controls are provided, at least one of each type shall be located on an accessible route, with all operable parts, including coin slots, within 40 inches (1016 mm) from the finished floor and shall comply with Section 1117B.6, Controls and operating mechanisms.

24 C.C.R. § 1115B.8.3.

Plaintiff testified that the location of the toilet seat cover dispenser "was too high. I couldn't reach it." (ECF No. 107 at 34). Blackseth testified that, during his August 17, 2009 inspection, he noticed the toilet seat dispenser "was not in the appropriate location," *id.* at 143, but that, during his November 7, 2012 inspection, "it had been moved.... [I]t was under 40 inches high and had a clear approach." *Id.* Blackseth, a C-5 quadriplegic himself, testified: "I am unaware of any C-5 quad that transfers himself independently. I've never used [a disposable toilet seat cover], never had a use for one. I don't know of friends that are similarly situated to my disability, I am unaware of them ever using them." *Id.* at 145.

The Court does not find Plaintiff's testimony, that he attempted to reach for a disposable seat cover, to be credible. Plaintiff testified that he uses the restroom to empty his leg bag, and offered no testimony that he transfers himself independently onto the toilet; Blackseth testified that he is unaware of any quadriplegic who does so. In Plaintiff's opposition to Defendants' motion for summary judgment on Plaintiff's ADA claim as to this barrier, Plaintiff stated that "the location of the toilet seat covers behind the water does not relate to Strong's disability (a point that we freely conceded), and [P]laintiff has no objection to a grant of summary judgment – for want of Article III standing – on this barrier." (ECF No. 68 at 11). The Court finds that Plaintiff has failed to prove, by a preponderance of the evidence, that he "personally encountered" any barrier of access related to the location of the toilet seat cover dispenser during his visits to the Store. Cal. Civ. Code § 55.56(b), (c). The Court concludes that Defendants are entitled to judgment in their favor on Plaintiff's CDPA and Unruh Act claims as to this alleged barrier.

**J.    Pipes underneath the restroom sink**

Plaintiff testified that he attempted to wash his hands in the restroom but was unable to do so because "[t]he sink was exposed[.] [T]he hot water piper, and all the hardware underneath was exposed, [and] were not covered. I was afraid to burn my legs." (ECF No. 107 at 32). Plaintiff testified that he used the Store's restroom the day before the trial, and noticed that the sink pipes "were wrapped." *Id.* at 59-60.

Plaintiff has not cited to any current California accessibility guideline, and the Court is not aware of any guideline, regulating the wrapping of pipes in restrooms. Plaintiff has failed to prove, by a preponderance of the evidence, that the pipes underneath the sink in the restroom violated a construction-related accessibility standard. The Court concludes that Defendants are entitled to judgment in their favor on Plaintiff's CDPA and Unruh Act claims as to this alleged barrier.

**K.    Strike side clearance on the pull-side of the restroom door**

Pursuant to the California Code of Regulations, "Minimum maneuvering clearances at doors shall be as shown in Figures 11B-26A and 11B-26B." 24 C.C.R. § 1133B.2.4.2. Pursuant to Figure 11B-26A, an interior door must have a minimum of 18 inches of strike side clearance.

Plaintiff testified that he had difficulty leaving the restroom because the door was locked. (ECF No. 107 at 32). Plaintiff testified that he "tr[ied] to open the door at the same time and pull the door open [but] there was no room for me to back up and pull the door open by itself under my own power and get around the door to get out." *Id.* at 33. Plaintiff testified that he knocked on the door for 30 minutes until an employee heard him knocking and opened the door. *Id.* at 33-34. Plaintiff testified that he felt "frustrated [he] couldn't get out." *Id.* at 37-38. Plaintiff testified that, during his visit to the Store on November 7, 2012, he could not open the door to leave the restroom and that "someone helped [him]" open the door to leave. *Id.* at 70.

Blackseth testified that, based upon his measurements on November 7, 2012, "[t]here was 18 inches of strike side clearance on the pull side [of the Store's main

restroom door]." *Id.* at 140. When counsel for Plaintiff questioned Blackseth about the strike side clearance during Plaintiff's visits to the Store, the following exchange took place:

> Blackseth: I would find it almost inconceivable there were structural walls that they moved [between 2009 and 2012].
>
> Counsel: I would agree it would seem –
>
> Blackseth I don't know that the structural walls haven't been moved. I would give you that.
>
> Counsel: Fair enough. Little victories, sir.

*Id.* at 171-172.

Plaintiff has presented no evidence that any structural changes took place between Plaintiff's visits to the Store in 2009 and Blackseth's visit on November 7, 2012, when he measured the strike side clearance of the restroom door at 18 inches. Because an 18-inch clearance satisfies the requirements of the California Building Code, the Court finds that Plaintiff has failed to prove, by a preponderance of the evidence, that the strike side clearance of the restroom door violated a construction-related accessibility standard. *See* 24 C.C.R. § 1133B.2.4.2, Figure 11B-26A. The Court concludes that Defendants are entitled to judgment in their favor on Plaintiff's CDPA and Unruh Act claims as to this alleged barrier.

## CONCLUSION

IT IS HEREBY ORDERED that Defendants' Motion to Strike (ECF No. 116) Plaintiff's post-trial submissions is DENIED. Defendants' Motion to Strike (ECF No. 108) certain evidence outside the scope of the final pretrial conference order is GRANTED. The following motions are denied as moot: Defendants' Motion for Judgment as a Matter of Law (ECF No. 109), Plaintiff's Motion to Strike Legal Conclusions from Kim Blackseth's Testimony (ECF No. 115) and Plaintiff's Motion for Judgment on Partial Findings (ECF No. 114).

//

//

1    The Clerk of the Court shall enter judgment in favor of Defendants and against

2    Plaintiff as to all claims.  Any request for attorneys' fees shall be made by separate

3    motion in accordance with Federal Rule of Civil Procedure 54(d)(2) within thirty (30)

4    days of the date of this Order.

5

6    DATED: __5/9/13__                    _____
                                          **WILLIAM Q. HAYES**
7                                         United States District Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28